## Case No. 3,223.

### CORBETT v. WOODWARD.

[5 Sawy. 403; 11 Chi. Leg. News, 246.] [1]

Circuit Court, D. Oregon. Feb. Term, 1879.

ASSIGNMENT OF MORTGAGE—CORPORATION—MEETING OF—INDORSER, LIABILITY AND PREFERENCE—BOND, LIABILITY OF SURETY ON—MORTGAGE FOR LOAN WITH INTENT TO PREFER MORTGAGEE—DIRECTORS OF CORPORATION ARE TRUSTEES—ILLEGAL CONSIDERATION.

1. A mortgage is a mere chose in action, and is not negotiable under the law-merchant, and therefore the assignee of such an instrument takes it subject to the equities between the mortgagor and mortgagee, and with the same and no other rights than his assignor had.

2. Where the by-laws of a corporation authorized the president thereof to call special meetings of the directors upon giving notice of the time and place thereof, and such place was not prescribed by the by-laws, the president may call such meeting at a place other than the principal place of business of the corporation.

3. G. indorsed the note of S., and upon its maturity waived demand and notice; at the same time O., who was indebted to S., with the knowledge and assent of G. guaranteed the payment of the note to the holder in sixty days, and afterwards, being insolvent, paid it: *Held*, 1. That G. was not under any liability for O., and that therefore the payment of said note by O. was not a payment for the benefit of G. within the purview of section 35 of the bankrupt act; 2. That the liability of G. upon said note after the waiver of demand and notice became fixed, and was not discharged by the agreement between S. and O; 3. That an indorser or surety is not discharged from his liability by an extension of time to the principal before maturity of the note, if made without consideration to the holder of the note from the principal, or with the assent of the surety or indorser.

4. A surety on a bond for the construction of a revenue cutter, is not, prior to the forfeiture of such bond, under a liability for his principal within the meaning of section 35, of the bankrupt act.

5. A mortgage by an insolvent corporation to secure a loan, obtained with the intent to give the mortgagee an unlawful preference, is not affected by that fact, if such intent was not carried out, and the money was otherwise applied.

6. The directors of a corporation are trustees for the stockholders and creditors; and where a director by means of his power, as such, secures to himself any advantage over other stockholders, or creditors, equity will treat the transaction as void, or charge him as trustee for the benefit of the injured parties; nor can such director, as to such parties, claim to have acted in ignorance of what it was his duty to know concerning the conduct and condition of the affairs of the corporation.

[Cited in Lippincott v. Shaw Carriage Co., 25 Fed. 586; Adams v. Kehlor Milling Co., 35 Fed. 435.]

7. Where a mortgage is given partly upon a legal and partly upon an illegal consideration, and the one is clearly separable from the other, it will be held valid as to the former and void as to the residue.

Suit [by Elijah Corbett against George Woodward, assignee in bankruptcy of the

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. Syllabus only in 11 Chi. Leg. News, 246.]

Oregon Iron Works, and others] to enforce the lien of a mortgage.

W. Lair Hill, H. Y. Thompson, and George H. Durham, for complainant.

Joseph N. Dolph and M. W. Fechheimer, for defendant.

DEADY, District Judge. This suit is brought to enforce the lien of a mortgage upon the works, tools and machinery of the Oregon Iron Works, a corporation doing business at Albina. The case was heard upon the bill, answer, replication, exhibits, and the testimony of witnesses.

The material facts of the case are as follows: On December 3, 1874, the Oregon Iron Works was duly incorporated under the laws of Oregon, for the purpose of "establishing a foundry and manufacturing agricultural implements and all kinds of machinery, boilers, locomotives and iron, with power to borrow and loan money, as well as to purchase and dispose of real and personal property, and all other business pertaining to a foundry," at Albina, Oregon, with a capital stock of fifty thousand dollars, divided into shares of one hundred dollars each. The stock was subscribed as follows: Edwin Russell, two hundred and forty-eight shares; Mrs. M. A. H. Berry, by her attorney, Edwin Russell, two hundred and fifty shares; Bernard Goldsmith one share and John McCracken one share—the shares of Goldsmith and McCracken being in fact given to them by said Russell to enable them to serve as directors, with the understanding that he would pay all assessments thereon. At a meeting of the stockholders, held on December 5, 1874, said Russell, Goldsmith and McCracken were duly elected directors of said corporation; and remained such directors until said corporation was adjudged a bankrupt, as hereinafter stated. At the same meeting by-laws were adopted, by which, among other things, it was provided that the officers of the corporation should consist of a president, secretary, and three directors; that a regular meeting of the directors should be held at the principal office of the company, at Albina, on the first Saturday in December; that special meetings might "be called at any time by the president, by giving written notice of the time and place of such meeting to every director;" and that the president should have the "general care and superintendence of the business of the company;" and be authorized to borrow money for its use not exceeding fifty thousand dollars, and to deposit and check for the same.

On May 28, 1875, the Oregon Iron Works, by Edwin Russell, its president, entered into a contract with the United States to build and "deliver afloat and complete in all respects * * * at the port of Albina, opposite to Portland, Oregon, a steam propeller of about two hundred and twenty-seven tons burden," for a revenue steamer, for which it was to receive ninety-two thousand dollars, in five installments of eighteen thousand four hundred dollars each, as the work progressed, upon the certificate of the superintendent of construction—the last of said installments to be paid upon the final completion of the vessel, and "a successful trial trip at sea of not less than twenty-four hours;" and on the same day executed a bond to the United States for the faithful performance of said contract in the penal sum of forty-six thousand dollars, with said Goldsmith and Philip Wasserman as sureties. See The Revenue Cutter [Case No. 11,714].

On March 18, 1876, John F. Steffen, a subcontractor under said corporation for the construction of the hull of said vessel, made his promissory note for the sum of two thousand dollars, payable three months after date to the order of said Goldsmith, who then and there indorsed the same for the accommodation of said Steffen, which note said Steffen then and there negotiated to William Druck without discount; that when said note became due it was not paid, and Goldsmith, on June 19, indorsed thereon a waiver of notice of demand and protest, and said corporation being then indebted to said Steffen upon the sub-contract aforesaid, at the request of said Steffen and with the consent of said Goldsmith and Druck, guaranteed in writing the payment of the same within sixty days thereafter, and paid it in on September 23, with interest, amounting to the sum of two thousand one hundred and forty-six dollars and eight cents—but not until after an action was commenced thereon, to wit, on September 18, against said Steffen and Goldsmith.

On and before September 21, 1876, the Oregon Iron Works was hopelessly insolvent, and thereafter, on November 18, it was duly adjudged a bankrupt, and the defendant, Woodward, chosen assignee of its estate.

No assessment was ever made upon the shares of the stockholders, except one of forty per centum, on April 30, 1875, which was paid by Russell by a sale to the corporation of the river blocks in Albina, numbered 16, 17 and 18, upon which its works are erected, for four thousand dollars, and his note for six thousand dollars. The nominal paid up capital of the corporation was therefore twenty thousand dollars, which, on January 1, 1875, as appears by its books, had been reduced to thirteen thousand four hundred and thirty-five dollars and twenty-seven cents. When it was adjudged a bankrupt, its liabilities, as appears from its schedules, exclusive of interest on bills payable, amounted to ninety-three thousand one hundred and forty dollars and ninety cents, and its assets to fifty-five thousand two hundred and forty-six dollars and two cents; but of this latter sum, eighteen thousand seven hundred and ninety-one dollars and ninety-three cents consists of a claim against Steffen for damages for non-performance of his

contract, which is of doubtful validity, and certainly of no value; seventeen thousand seven hundred and ninety-five dollars and seven cents of indebtedness due from Russell, which has no value—six thousand dollars upon his note given in payment of the assessment aforesaid, and the balance—eleven thousand seven hundred and ninety-five dollars and seven cents upon an open account; and four thousand and seventy-seven dollars and ninety-four cents due upon sundry open accounts, and five hundred and forty-eight dollars and seventy-seven cents upon bills receivable, out of which the assignee, up to February 8, 1878, had only been able to collect about three thousand dollars, the remainder being probably worthless. The remainder of the assets are material on hand, two thousand eight hundred and eighty-three dollars and sixty-six cents, and portable and other engines complete and incomplete, eleven thousand one hundred and forty-eight dollars and sixty-six cents, which were sold for less than eight thousand dollars; the blocks 16, 17 and 18 aforesaid, and the works not valued in the schedules, but charged in the books at four thousand dollars, and twenty-nine thousand seven hundred and ten dollars and eighty-five cents respectively, and worth, taken together, according to the evidence, not exceeding twenty thousand dollars; so that the indebtedness exceeded the available assets at least sixty-three thousand dollars, or more than threefold.

Early in September, 1876, Russell went to San Francisco to obtain aid for the iron works, and while he was absent the workmen employed upon the vessel refused to continue, unless provision was made for the payment of their wages, the corporation being unable to meet its engagements with them, whereupon Goldsmith guaranteed such payment until Russell's return, telling the secretary to keep only such hands in the meantime as were absolutely necessary. Upon the return of Russell, between the eighteenth and twenty-first of September. he informed Goldsmith that the corporation needed at least twenty thousand dollars to complete the construction of the revenue vessel and other business on hand, and induced him on September 21, 1876, to sign the note of the corporation for the sum of twenty thousand dollars as surety, payable to the First National Bank of Portland one day after date, in consideration that said corporation would give him a mortgage upon its works, machinery and tools, to secure said Goldsmith against loss, by reason of such signing, and would also pay him a commission of one thousand dollars or five per centum of the amount of such note; and with the further understanding between said Goldsmith and Russell, that said corporation would immediately pay the note aforesaid, held by Druck, upon which an action was then pending against Goldsmith and Steffen, and,

also, as soon as they became due, two notes amounting to six thousand dollars, made by Russell in his individual capacity and indorsed by Goldsmith for his accommodation, and payable to Ladd and Tilton within a short time. In pursuance of this arrangement Russell, on September 21, made the note of the corporation for twenty thousand dollars with Goldsmith as surety, and payable as aforesaid, and with the proceeds thereof paid the Steffen note with interest, two thousand one hundred and forty-nine dollars and eight cents, and the one thousand dollars commission to Goldsmith, but did not pay the notes due Ladd and Tilton as aforesaid, but the same were afterwards paid by Goldsmith; and on September 22, said Russell mortgaged the property of the corporation to Goldsmith to secure him against loss as aforesaid.

The authority for executing the mortgage was as follows: At a special meeting of the directors called by the president and held on September 21, 1876, in the office of Goldsmith, at Portland, about a mile distant from Albina, and but a short distance from the place of business of John McCracken, a resolution was passed, authorizing Russell to obtain the loan and execute the mortgage to Goldsmith, as president, as aforesaid; but only the directors, Goldsmith and Russell; were present at such meeting; McCracken being confined to his house by a serious illness, and unable to attend, although Russell left a written notice for him of the time and place of meeting at his place of business on the same day, and but a short time before the meeting was held, which McCracken did not receive, and could not have complied with if he had.

There was no desire or intention upon the part of Russell or Goldsmith to hold this meeting without the presence of McCracken, for it was understood and expected that both he and Goldsmith would act in all matters, if otherwise lawful, as desired by Russell, to whom as between them the enterprise in fact belonged, and by whom it was expected it should be controlled. At the date of this loan and mortgage the first four payments on the contract to construct the vessel had been received by the corporation, and the fifth and last one had been hypothecated to the national bank aforesaid, to secure seventeen thousand and thirty-one dollars and sixty-three cents of a prior indebtedness to such bank of eighteen thousand three hundred and ninety-nine dollars and ninety-six cents; and the corporation was also indebted to Ladd & Tilton, bankers, on its notes sixteen thousand dollars, nearly all of which was over due eighteen months, and twelve thousand one hundred and one dollars on overdraft.

The corporation having failed to pay said note of twenty thousand dollars, and Goldsmith being unable to do so when demanded, the latter procured Elijah Corbett to take up the same on January 3, 1877, by giving

his note for the sum then due thereon, twenty thousand six hundred and eighty-six dollars and sixty-seven cents, payable one day after date to the said bank, in consideration of which said Goldsmith duly assigned to him said mortgage, and together with Philip Wasserman aforesaid, made and delivered to him a writing, by which they undertook and agreed to make up and pay any loss which said Corbett might sustain by reason of taking up said note, he using due diligence to enforce said mortgage.

The defendant maintains that the mortgage is void, and therefore the complainant is not entitled to the relief sought, because (1) the execution of the note and mortgage was unauthorized; (2) the transaction constituted an unlawful preference to Goldsmith, contrary to section 35 of the bankrupt act [of 1867 (14 Stat. 534)]—section 5128, Rev. St.; and (3) in taking such preference, Goldsmith violated his trust as a director of the corporation.

This mortgage was given to Goldsmith to indemnify him against loss as surety upon the note of the corporation to the bank, and as a contract it included only himself and his principal. And although the mortgage and note are a part of the same transaction, yet the former was not given to the bank to secure the payment of the latter, and therefore it is not an incident of it, and does not, in equity, pass with it, as such, to a third person. Neither is it a negotiable instrument, which would, under the law-merchant, pass into the hands of a third person, by indorsement or delivery, freed from any equities or defects which might attach to it as between the original parties to it. It is a mere chose in action, and passes by assignment subject to the equities existing between the mortgagor and the mortgagee. Therefore, in this suit, the complainant, Corbett, stands in the place of his assignor, Goldsmith, with the same, and no other, rights in the premises. In re Kansas City, etc. [Case No. 7,610]; U. S. v. Sturges [Id. 16,414]; Fales v. Mayberry [Id. 4,622].

The question arises then, was this note and mortgage authorized by the corporation? The power conferred upon the president by the by-laws to borrow money when the necessity of the corporation might require it, has been invoked by the complainant to sustain the loan, but as the limit of this authority, fifty thousand dollars, had already been exceeded by the president, no support to the transaction can be derived from this source. It is also contended by the defendant that the use of the money obtained by the loan in the affairs of the corporation was a ratification of the act of the president in making it. The authorities cited in support of this proposition are all cases where there was a formal ratification of an informal or unauthorized act by the directors or governors of the corporation assembled in a formal meeting. But in this case, there never was any meeting of the directors after the making of the note and mortgage, and therefore there could be no ratification by them. A corporation acts by its directors; and to do so, they or a majority of them must meet together as a board, and that fact, and their action thereat, must appear from its records. In re St. Helen Mill Co. [Case No. 12,222].

Failing upon these points, the complainant maintains that the note and mortgage were duly authorized at the meeting of the directors on September 21. The defendant objects to the authority of this meeting, that it was not duly called, and the directors not being all present, it had no authority to act. It is claimed that the meeting was not duly called, because not called at the place where the corporation had its principal place of business, and because McCracken was not duly notified of it. There is nothing in the corporation act of this state which requires the directors of a corporation to hold their meetings at the place where it has its principal office or place of business, or elsewhere. The statute is silent upon the subject. The matter is left where it properly belongs, to be regulated by the by-laws of each corporation to suit its own convenience. The by-laws of this corporation provided for the holding of one regular meeting a year, of the directors, at its principal office or place of business, Albina, and gave the president unqualified authority to call special meetings at any time by giving written notice of the time and place thereof. The plain inference from this is, that the president was authorized to name the place as well as the time of a special meeting, and therefore he might exercise his judgment in the premises, and name some other place than Albina, Portland, for instance, the place where the other two directors lived, and carried on business, and could most conveniently attend such meeting.

The notice to McCracken was a written one. It was left by the president at his place of business, and was doubtless sufficient to have secured his attendance if he had not been confined to his house by illness. His indisposition appears to have been well known, and the notice to him was naturally regarded somewhat as a matter of form. The corporation act (section 11, Code Oregon, p. 527) provides that the powers vested in the directors may be exercised by a majority of them. True, the by-laws of this corporation provided that all the directors should have notice of the time and place of a special meeting. But no particular notice is prescribed, and I think, under the circumstances, this was sufficient. Indeed, it is not certain that in this case it was absolutely necessary to give notice to McCracken at all. The business of the corporation could not nor need not be delayed to await his recovery; and if he was clearly too ill to attend, notice to him would have been

a useless act. But, be this as it may, such notice was left for him at his place of business as gave him an opportunity, if he had been able, to be present at the meeting.

The note and mortgage having been fully authorized by the directors, and duly executed by the president and secretary, was the transaction an unlawful preference to Goldsmith under the bankrupt law?

As counsel for the defendant admits, to bring this transaction within section 35 of the bankrupt act (section 5128, Rev. St.), it is necessary to show (1) that the corporation was insolvent at the date of the mortgage; (2) that Goldsmith was then a creditor of the corporation or under a liability for it; (3) that the mortgage was made with a view to give Goldsmith a preference; and (4) that the latter had reasonable cause to believe that the corporation was insolvent, and that he knew the mortgage was made in fraud of the law. About the insolvency of the corporation there can be no doubt; and if Goldsmith was a creditor of the corporation or under a liability for it, and the money obtained upon the transaction was applied upon his claim, or to discharge such liability, then he received a preference, and the reasonable inference is, that the mortgage was made with that view—for that purpose. Toof v. Martin, 13 Wall. [80 U. S.] 48; In re Sutherland [Case No. 13,638]. But upon the facts it does not appear that Goldsmith was a creditor of the corporation, or under any liability for it.

The claim of the defendant is, that Goldsmith was under a liability for the corporation upon the Steffen note. But certainly this is not well founded. Goldsmith's relation to this note was simply that of an accommodation indorser for Steffen. He thereby came under a liability for Steffen, but for no one else. Nor was his relation thereto changed by the fact that the corporation subsequently guaranteed its payment. The only effect of this was to put the corporation under some sort of liability for Goldsmith. Neither did the transaction make Goldsmith a creditor of the corporation, although that was probably the effect of it as to Druck. The plain fact is, that the corporation agreed to pay this note to Druck for Steffen, because it was indebted to Steffen and unable to pay him, and the subsequent payment of it out of the money obtained on this note and mortgage, if it operated as a preference at all, operated as a preference in favor of Druck and Steffen, and not Goldsmith.

It is also claimed by the defendant that Goldsmith, being on the bond of the corporation for the construction of the vessel, was to that extent "under a liability" for it; that this money was procured for the purpose, and applied to the discharge of such liability by paying the debts incurred in its construction, and purchasing labor and material for its completion.

It is difficult to say upon the evidence what disposition was made of all this twenty thousand dollars, but it appears probable that the greater portion of it was applied as suggested.

But the bond was not forfeited—at least no claim to that effect was or is made, and the reserved or last payment was largely in excess of what was necessary to complete the vessel. Goldsmith's liability on the bond was yet contingent and not absolute. In my judgment, the liability contemplated by the statute, is an absolute, and not a contingent one. No authorities on this point have been cited by counsel for either party. In Bean v. Laflin [Case No. 1,172], it was held that when the principal on a note, though insolvent, paid it at maturity and was adjudged a bankrupt, that the assignee could not recover it from a co-maker who was a surety in fact, because his liability up to the maturity and payment of the note was contingent, and never became absolute, and therefore was not "benefited" by such payment in the legal sense of the term. This ruling is in consonance with the provisions of section 19 of the bankrupt act, and the decisions thereunder, to the effect that contingent liabilities, including that of an indorser prior to demand and notice, are not debts provable in bankruptcy. See Bankrupt Act, § 19 (Rev. St. § 5067 et seq.); In re Loder [Case No. 8,457]; In re Nickodemus [Id. 10,-254].

The case of Bartholow v. Bean, 18 Wall. [85 U. S.] 635, cited by the defendant, which arose out of the same bankruptcy as Bean v. Laflin, supra, does not differ from this; for there, although the payment by the insolvent debtor and principal of the note was held to be a preference to his indorser, the liability of such indorser had already become fixed and absolute.

This mortgage is also claimed to be void on the further ground that the transaction was had with a view to procure money to pay the individual notes of Russell, amounting to six thousand dollars, due Ladd & Tilton, upon which Goldsmith was an indorser. But there are three answers to this claim, either of which are sufficient: (1) The individual debt of Russell to Ladd & Tilton was not the debt of the corporation, and whatever liability Goldsmith might have been under on account of it, it was for Russell and not the corporation which is alleged to have made this mortgage with intent to give a preference; (2) so far as appears, Goldsmith's liability upon those notes was yet contingent and not fixed—they were not yet due; (3) the purpose to pay these notes with this money was never carried out, and the amount was otherwise applied by the corporation, without in any way benefiting Goldsmith. Indeed, Russell failed to pay the notes at all, and Goldsmith was compelled to pay them himself. An intention to prefer or to make any unlawful use of this money did not affect the legality of the transac-

tion, if it was never carried into action. But admitting that this mortgage is valid, notwithstanding the bankrupt law, the defendant insists that it is void in equity, because the corporation being insolvent, Goldsmith, as a director, by means of this transaction, secured an advantage to himself at the expense of the creditors of the corporation, in plain violation of his trust. In support of this, it is claimed that Goldsmith, being liable to pay the Steffen note and the two individual notes of Russell, as a director, authorized and procured this loan and mortgage with the understanding and for the purpose of obtaining funds, by mortgaging the principal property of the corporation, to pay off these notes, and thus free himself from such liability at the expense of the creditors. So far as the Russell notes are concerned, the transaction is valid. For, although the loan and mortgage was undoubtedly made with a view, among other things, of raising money to pay them with, yet the fact being that for some reason the money was not so applied, the creditors of the corporation suffered no inconvenience on that account. But as to the Steffen note, the circumstances are different. At the date of the mortgage, Goldsmith, although not a creditor of the corporation, was liable as a principal upon the Steffen note. This instrument was overdue, and he had waived demand and notice. The guaranty of the corporation did not affect him. That was merely a collateral security to the holder. It is even doubtful if there was any extension of time or payment as to Goldsmith and Steffen. The guaranty of the corporation was that the note should be paid in sixty days, but there was no agreement between Druck and Goldsmith and Steffen, or either of them, that they should have any further time to pay in. But assuming that the agreement between Druck and the corporation impliedly extended the time of payment sixty days, that did not discharge Goldsmith from his liability. In the first place, the note being overdue and demand and notice having been waived, Goldsmith's liability was no longer contingent, that of an indorser, but absolute, that of a maker or principal. But if the supposed extension had been given while he was yet only an indorser, he would not have been discharged thereby, because (1) the agreement or guarantee was not between the principal in the note, Steffen, and the indorsee, Druck, but between the latter and a third person, the corporation; (2) there was no consideration for the supposed agreement to extend the time, as between Druck and Steffen; and (3) if the facts were otherwise in these particulars, it is manifest that the agreement between Druck and the corporation, which it is claimed operated as an extension of time, as to Steffen, was made in the interest of Goldsmith and with his full knowledge and assent, and therefore he cannot claim to be discharged by it. Upon these points it is unnecessary to consume time in argument or citation of authorities. It is sufficient to refer to Daniel, Neg. Inst. § 1312 et seq.

It is also contended that Goldsmith was not aware of the insolvency of the corporation; Russell having told him at the time that it was "prosperous and perfectly solvent."

It is difficult to see how a director of this corporation could have been ignorant of its insolvency, except upon the theory that he was a director only in form, and knew nothing thereby of its internal arrangement or affairs, and this appears to have been the character of Goldsmith's directorship. It was probably accepted and held by him as a matter of form to accommodate Russell in an enterprise which substantially belonged to the latter, and in which he had nothing invested.

But, be this as it may, the law will not permit a person to become a director in a corporation, and neglect the duties and avoid the responsibilities thereof, as to third persons, with impunity. A voluntary ignorance of what it is his duty to know and understand is no excuse for him when the rights of others are in question. By becoming a director, which includes the taking an oath to "faithfully and honestly discharge" the duties of the office, he engages to take good care of the interests of the stockholders and creditors intrusted to his charge, and this necessarily implies that he will use due diligence to keep himself properly informed concerning the same.

An examination of the books of the corporation at any time for a considerable period of time prior to the date of the mortgage would have shown Mr. Goldsmith that it was insolvent; and that as far back as January 1, 1876, it had sunk nearly seven thousand dollars of its nominally paid up capital.

A director of an incorporation is a trustee of its property and assets for its stockholders and creditors, and it is contrary to the first principles of equity that he should deal with such property for his own advantage and to their injury. Koehler v. Black River Co., 2 Black [67 U. S.] 720; Drury v. Cross, 7 Wall. [74 U. S.] 302; Butts v. Wood, 38 Barb. 188; Curran v. Arkansas, 15 How. [56 U. S.] 304; Sawyer v. Hoag, 17 Wall. [84 U. S.] 620; Bradley v. Farwell [Case No. 1,779].

In Koehler v. Black River Co., supra, the corporation being in embarrassed circumstances, the directors secured debts due some of themselves to the prejudice of the other creditors. In delivering the opinion of the court Mr. Justice Davis says: "Directors cannot thus deal with the important interests entrusted to their management. They hold a place of trust, and are obliged by accepting that trust to execute it with fidelity; not for their own benefit, but for the common benefit of the stockholders of the corporation. In executing this mortgage, and thereby secur-

ing to themselves advantages that were not common to all the stockholders, they were guilty of an unauthorized act, and violated a plain principle of equity applicable to trustees."

In Drury v. Cross, supra, the directors of a corporation provided for the payment of debts upon which they were liable as indorsers, with the assets of the corporation. In delivering the opinion of the court, Mr. Justice Davis says: "The transaction which this case discloses cannot be sustained in a court of equity. The conduct of the directors of this railroad company was very discreditable and without authority of law. It was their duty to administer the important matters committed to their charge for the benefit of all parties interested, and in securing to themselves advantages not common to the others, they were guilty of a plain breach of trust."

In Bradley v. Farwell, supra, the directors of an insolvent corporation transferred its assets to a creditor composed of a partnership of which one of them was a member. The transaction was declared void, and the court, Shipley, J., says: "The fiduciary relation between the directors and the creditors being established, and the fact that the trustees in dealing with the trust fund have secured to themselves a benefit or advantage over the creditors, or a benefit or advantage to themselves as creditors over and above other creditors, taints the transaction and invokes the aid of a court of equity to see to the right execution of the trust. Not that the trustees cannot prefer one creditor to the others at common law, and outside the provisions of the bankrupt act, but that, in equity, a trustee cannot contract with himself as he may with a third party. If he exercises in his own favor the powers he may rightfully exercise in favor of another, the court does not stop to inquire whether he gained or lost. It is enough that the beneficiary is dissatisfied with the transaction for the court to set the transaction aside, without requiring the beneficiary to prove actual loss or fraud."

The one thousand dollars taken out of this loan by Goldsmith as a compensation for going on the corporation note, in my judgment comes within the spirit of the rule laid down in these authorities. The transaction was in fact a dealing with a trust fund by a trustee —a dealing with himself, that is liable to great abuse, and I think ought not to be tolerated. When Goldsmith went security for his corporation for a loan for the benefit of its business or creditors, it was so far proper and right that he should be indemnified by a mortgage of its property; but to take five per centum, or any other portion of the loan as a compensation for an act which was voluntary, and for which he was secured against loss, appears to me to have been an unlawful appropriation of the trust fund.

The great extent to which corporations have become the agency through which the business of the country is transacted, and its property is held and managed, makes it necessary that the salutary rules enforced by courts of equity in other cases of fiduciary relation should be rigidly applied to the numerous and important trusts held by the managers of these organizations. And in the case of insolvent corporations, like the Oregon Iron Works, there is every reason to exact the most scrupulous conduct at the hands of their directors when dealing with the trust property. As was well said in Bradley v. Farwell, supra: "Standing in a fiduciary relation, as it were at the bedside of a dying friend, if they are subsequently found in possession of a portion of his effects, they must show title by a conveyance, untainted by the exercise of that power which the trust relation gave them to influence the disposition made by the decedent of his property in their favor, to the prejudice of others having equal claims to the inheritance."

Goldsmith also admits that at the time of making the mortgage, he was under a liability for the corporation of one hundred and twenty-five dollars, due the workmen on the vessel, which he had guaranteed the payment of, and which was paid out of this loan, and expected to be. Standing by itself, the rule de minimis non curat lex, might have applied to so small a matter as this, compared with the magnitude of the transaction, but as it is, it must be added to the other circumstances of the transaction which the law pronounces unlawful.

Much has been said by counsel about the knowledge and purpose with which Goldsmith participated in this transaction. It is probable, as has been suggested, that he regarded his official relation to the subject as one of mere form, and did not stop to consider, or was unaware that in law he was a director, under the same obligation to the creditors of the corporation as if he had been actually engaged in the management of its affairs and familiar with its financial condition. So far as the payment of the Steffen note is concerned, the taking of the commission for signing the corporation note, and the payment of the sum guaranteed to the workmen, I find that the consideration for this mortgage is unlawful, because the transaction was so far contrary to equity and the rules prescribed for the conduct of trustees; but I do not find a conscious purpose or actual intention upon the part of Goldsmith to gain an advantage for himself at the expense of the creditors of the corporation, although such was the effect of his conduct, viewed in the light of all the circumstances including the final result.

It remains to be considered what is the effect of this illegality upon the mortgage. Does it avoid it wholly or pro tanto, only so far as the illegal consideration extends? The matter is not free from doubt, and was not noticed by counsel. But I think the better

rule is, that where the illegal consideration is clearly separable from the legal, that the contract is good for the latter, and only void as to the residue.

In Denny v. Dana, 56 Mass. [2 Cush.] 161, it was held that a mortgage of personal property, which, as to some of the debt thereby secured, was contrary to the solvent laws, is wholly void. But in Bucknam v. Goss [Case No. 2,097], the correctness of this rule is questioned, and Fox, J., expressed the opinion that where a certain part of a loan became part of the assets of the debtor's estate, that the assignee should not be allowed to avoid the security therefor; and in Re Stowe, etc. [Id. 13,513], the same judge held, that when a mortgage is given for a debt which was an unlawful preference, and another that was not, it was valid as to the latter though void as to the former.

In U. S. v. Bradley, 10 Pet. [35 U. S.] 343, it was held that a deed may in many cases be good in part, and void for the residue, where the residue is founded in the illegality, but not malum in se.

The illegal consideration in this case is the sum paid on the Steffen note, two thousand one hundred and forty-nine dollars, the sum paid to a director as commissions, one thousand dollars, and the wages guaranteed by him, and paid by the corporation out of this loan, one hundred and twenty-five dollars, making in all the sum of three thousand two hundred and seventy-four dollars; which deducted from twenty thousand dollars leaves sixteen thousand seven hundred and twenty-six dollars, which sum, with interest at one per centum per month from the date of the mortgage makes the amount nineteen thousand five hundred and sixty-nine dollars and forty-two cents, for which the complainant is entitled to a lien upon the premises from the date of the mortgage, and to a sale of them to satisfy the same, and there will be a decree accordingly.